## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

         Plaintiff,

vs.                                                                        No.  CR-03-477 MV

ERIC L. JOHNSON,

         Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Eric L. Johnson's Motion to Suppress **[Doc. No. 19]**, filed August 14, 2003.  The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is not well taken and will be **DENIED**.

## BACKGROUND

On the morning of January 4, 2003, New Mexico State Police Officer Nick Ramos was patrolling Interstate 40.  At 9:00 a.m., as he was completing a traffic stop and walking back to his patrol car, Officer Ramos noticed a silver Mercury, later identified as Defendant's vehicle, traveling eastbound in the right lane on Interstate 40.  According to Officer Ramos' testimony, the Mercury was driving at an increased rate of speed and was dangerously close to the white line separating the right lane from the shoulder of the road where Officer Ramos was standing next to his patrol car. Officer Ramos testified that he noticed that there was a female in the passenger seat of the car, that her seat was reclined and that she did not appear to be wearing a seatbelt.  Officer Ramos further testified that, as Defendant drove past him, Officer Ramos entered his patrol car and immediately engaged his radar which showed that Defendant's car was traveling at a speed of 84 mph in a 75 mph

zone.  Officer Ramos drove after the Mercury, engaged his lights and stopped the car on the right shoulder of the road at mile post 148.

Officer Ramos testified that he parked two car lengths behind Defendant's car, exited his patrol car and approached the passenger side of Defendant's car.  According to Officer Ramos, he made contact with Defendant, greeted him and asked for his license and proof of registration and insurance.  Officer Ramos testified that the passenger, later identified as Camesha Taylor, was sitting in a partially reclined position and was wearing her seatbelt.  According to Officer Ramos, Defendant informed him that the car was a rental car and that he did not have a driver's license.  Defendant provided Officer Ramos with an identification card, which was expired, and an empty folder which appeared to have been for the car rental contract.  According to Officer Ramos, Defendant's hand was trembling as he handed him the identification card, which led Officer Ramos to believe that Defendant was nervous.

At that point, Officer Ramos asked Defendant to step out of his car and walk with him to the right front bumper area of the patrol car.  Defendant was not wearing a jacket but had on a sweatshirt with a hood and pockets.  The videotape of the stop shows that, at 9:01 a.m., Officer Ramos asked Defendant to take his hands out of his pockets, asked him if he had any weapons and then conducted a pat down search of Defendant.

Officer Ramos then radioed state police dispatch and requested a check on Defendant's identification number.  While he was waiting for a response, Officer Ramos asked Defendant where he was coming from, where he was going and why he was traveling.  Defendant informed him that they were coming from California and traveling to Alabama because his grandmother had died. Officer Ramos asked when and how she died, and Defendant replied that she had died two days

earlier, on January 2, 2003, of natural causes. Officer Ramos then asked who had rented the car for Defendant. Defendant replied that a friend named Billie Rae Bennett had rented the car two weeks earlier at LAX. Officer Ramos also asked Defendant the name of his passenger, how long he had known her and whether she was his girlfriend. Defendant provided Ms. Taylor's name and said that he had known her for a few weeks and that she was "like a girlfriend." Officer Ramos testified that he found it extremely unusual that Defendant had a friend rent a car for him two weeks before his grandmother died, "almost pre-planning the grandmother's death." Further, Officer Ramos testified that Defendant was very fidgety and was having trouble maintaining eye contact which led Officer Ramos to believe that something was wrong.

At 9:06 a.m., Officer Ramos told Defendant that he was going to check some numbers on his car and asked Defendant to wait at the front of the patrol car. Officer Ramos then proceeded to Defendant's car. Officer Ramos testified that, as he approached the car, he observed that Ms. Taylor looked at him with one eye open and then squeezed her eyes shut, suggesting to him that she was not asleep but wanted to appear to be asleep. Officer Ramos further testified that he attempted to get her attention several times and that, when Ms. Taylor finally acknowledged him, she acted as if she had been asleep the entire time, stretching and yawning. Officer Ramos testified that she acted this way despite the fact that when he first stopped Defendant's car and approached on the passenger side, Ms. Taylor was awake and was helping to look for documentation for the rental car. In addition, Officer Ramos noted that the videotape shows that Ms. Taylor had been moving around while he was talking with Defendant at the front of the patrol car. According to Officer Ramos, he found Ms. Taylor's behavior to be suspicious and to suggest that she was trying to conceal something or avoid dealing with him.

Officer Ramos checked the vehicle identification number against the Nader sticker. Officer Ramos testified that the two numbers matched, indicating that the car was not stolen. Officer Ramos further testified that although the matching numbers dispelled his suspicion that the car might be stolen, he was still suspicious that the car might have been embezzled or that the car was being used to transport contraband.

At 9:07 a.m., Officer Ramos was contacted by dispatch, who informed him that there was no record in California of an individual with Defendant's identification number. Officer Ramos testified that he found this very strange and that it raised suspicions in his mind. He commented to dispatch that something was going on here, although he did not know what it was.

Officer Ramos then questioned Ms. Taylor about her travel plans. Ms. Taylor advised him that they were coming from California and going to Alabama to visit Defendant's cousins. According to Officer Ramos, Ms. Taylor did not mention Defendant's grandmother's death, and spoke of the trip in a "jovial" manner. Officer Ramos testified that he found Ms. Taylor's response to be in direct conflict with what Defendant had informed him about their travel plans. Ms. Taylor also advised that they had originally intended to leave on January 1, 2003, but that they had subsequently changed their plans. Officer Ramos asked Ms. Taylor how long she had known Defendant and she replied that she had known him for a few weeks. Officer Ramos also asked for Ms. Taylor's information so that he could see if she would be able to drive the rental car.

At 9:12 a.m., Officer Ramos returned to the front of the patrol car, where Defendant was standing. He opened his citation book, but before writing anything he called dispatch to have them check Ms. Taylor's information to see if she had a valid driver's license. Officer Ramos testified that,

based upon his suspicion that some type of criminal activity was going on, he also asked dispatch to do a "III" criminal check on Defendant.

At 9:14 a.m., dispatch contacted Officer Ramos and reported that Ms. Taylor's identification card was valid, but that she did not have a driver's license. Officer Ramos then asked dispatch to do a "III" criminal check on Ms. Taylor. Dispatch next asked Officer Ramos whether Defendant was white or black; Officer Ramos responded that he was black.

At 9:17 a.m., Officer Ramos again began questioning Defendant about the rental car, asking whether he had any documentation for the rental and whether he had the telephone number for Hertz, the rental car company. Defendant replied in the negative. Officer Ramos also asked whether Defendant was on the rental contract. Defendant replied that he was not, that it all happened suddenly and that his friend, Ms. Bennett, had extended the original term of the contract for an additional week. Defendant offered to give Officer Ramos a telephone number for Ms. Bennett, but Officer Ramos declined the offer.

At 9:18 a.m, dispatch contacted Officer Ramos and told him that the criminal check on Ms. Taylor had come back negative. At this point, Officer Ramos told Defendant to wait right where he was and returned to Defendant's car. He asked Ms. Taylor whether she had any documentation with the telephone number for Hertz. Although Ms. Taylor gave him a telephone number, it was not the correct number. At 9:21 a.m., Officer Ramos returned to Defendant and began writing a citation. Defendant asked him whether he could just pay the citation fee to Officer Ramos directly and Officer Ramos replied that he could not take any payment from him. At that point, Ms. Taylor called Officer Ramos back to her, stating that she had found a telephone number for Hertz. Although Officer Ramos tried to call the number, it again was incorrect.

-5-

At 9:25 a.m., Officer Ramos contacted dispatch and requested a telephone number for the Hertz rental office at LAX.  Dispatch called back with a telephone number which Officer Ramos called on his cellular telephone and discovered was a telephone number for United States Customs. He again asked dispatch for a number and dispatch gave him another number which Officer Ramos called only to reach HP Global Workplaces.  Officer Ramos called dispatch a third time requesting a number for Hertz and dispatch provided a third number.  Officer Ramos called the number, which was correct, but then lost his connection.

At 9:43 a.m., Officer Ramos reached someone at Hertz.  Officer Ramos explained that he had stopped a car with no rental contract and that someone other than the driver or the passenger had rented the car.  He was transferred to a Hertz employee named Mary Jones.  He gave Ms. Jones the license plate number on Defendant's car and informed her that the driver had told him he was going to his grandmother's funeral and that someone else had rented the car, that there was no documentation for the rental and that the car had been rented at LAX.  Ms. Jones indicated that the car had been rented by Ms. Bennett on Christmas day, that the car was past due, that the contract had not been extended and that there were no secondary drivers authorized to drive the car.  Officer Ramos asked whether Defendant or Ms. Taylor was authorized to drive the car and she responded in the negative.  Officer Ramos then advised Ms. Jones that he had stopped the vehicle because the passenger was not wearing a seatbelt, that he had since determined that Defendant did not have a driver's license and that he intended to issue Defendant a citation for driving without a license.

At that point, Officer Ramos asked Ms. Jones whether she wanted the car impounded and she said she did.  He told her that the car would be taken to the state police office and that someone from Hertz would have to pick it up within the next couple of days.  Officer Ramos then advised Ms. Jones

that he believed that the individuals in possession of the rental car were engaged in some type of criminal activity and asked for her permission to search the car. Ms. Jones granted him permission to conduct a search. Officer Ramos completed his telephone call with Ms. Jones at 9:54 a.m.

Immediately thereafter, Officer Ramos contacted dispatch, who at that point had a return on the criminal history check on Defendant. In order to be sure that Defendant was the same individual as the one for whom dispatch had found the information, dispatch described several tatoos and Officer Ramos inquired of Defendant about his tatoos. Defendant's description of his tatoos matched the description provided by dispatch. At 9:56 a.m., Officer Ramos called dispatch, confirmed a match on the tatoos, and asked for a traffic arraignment date for Defendant. At that point, Officer Ramos informed Defendant that he was checking with the department for a court date for him, that he would get him on his way in a second, that he would not be a good police officer if he let him get back into the car without any paper work, and that he would get right back with him.

Officer Ramos then was in contact with dispatch from 10:00 a.m. until 10:03 a.m. Officer Ramos testified that, during this call, dispatch was relaying Defendant's criminal history to him. Officer Ramos testified that there were "three sheets worth of information" and that Defendant's criminal history included felony convictions.

At 10:03 a.m., Officer Ramos returned to writing Defendant's citation. He asked Defendant if he knew why he had stopped him and Defendant replied that he "was going kind of fast." Officer Ramos replied, yes, and also said that it looked like his passenger was not wearing her seatbelt although she had it on when he approached the car. Officer Ramos advised Defendant that he was only going to issue one citation for driving without a license, that the citation would require a court appearance and that Defendant should call the telephone number he was providing to him in advance

of the court date.   At 10:06 a.m., Officer Ramos handed Defendant a copy of the citation and returned his documentation to him.

As Defendant turned around and began walking back toward his car, Officer Ramos shouted out, "By the way..."   Defendant stopped, turned back around and walked back toward Officer Ramos. Officer Ramos then asked him, "Who did you say rented the car?"   Defendant again advised him that Billie Rae Bennett rented the car.   Officer Ramos then asked Defendant whether he was carrying any large amounts of money, any marijuana, cocaine, heroin, methamphetamine or other drugs or any weapons.   Defendant replied in the negative to each question.   According to his testimony, Officer Ramos observed that Defendant broke eye contact with him when he asked whether he was carrying any marijuana which suggested to him that Defendant was not telling the truth.

Officer Ramos then asked Defendant for permission to search his car.   Defendant said yes and Officer Ramos provided him with a New Mexico state police consent to search form which he asked Defendant to sign.   Defendant asked whether, even if he said he just wanted to leave, Officer Ramos would search the car anyway.   Officer Ramos replied, no, and Defendant asked whether he could just leave.   Officer Ramos said yes, you have the right to refuse the search and then asked whether Defendant did not want him to search his car.   Defendant said that he did not want him to search the car, that he was cold and that he just wanted to leave.   Officer Ramos said, "Okay, hold on one second."   Officer Ramos then explained that Hertz had informed him that the rental contract had expired on December 31, 2002 and that Hertz wanted him to impound the car.   He asked Defendant whether he had any luggage and to identify that luggage for which he was responsible.   He then told Defendant to wait for him right there and that he would be right back.

At 10:09 a.m., Officer Ramos again approached Defendant's car and questioned Ms. Taylor. While he was questioning her, another police officer was standing with him.[1] He asked her again where she was coming from to which she again replied, California. He then asked her whether she was carrying any large amounts of money or drugs. She replied in the negative. Finally, Officer Ramos asked whether she was responsible for everything in the car. She replied that she was responsible only for her cigarette case, her purse and her luggage. Officer Ramos then instructed Ms. Taylor to wait right there.

Officer Ramos then walked away from Defendant's car and stood on the shoulder of the road with another officer. At 10:12 a.m., he called dispatch and requested a canine unit. He told dispatch that he would call back in fifteen minutes once he "was finished here."

At 10:15 a.m., Officer Ramos walked back over to Defendant and told him that a drug dog was coming out and that he would get him on his way. He then asked another officer to call a tow truck. At that point, he informed Defendant that he would take him where he wanted to go but that his car would have to be towed.

At 10:16 a.m., Officer Ramos turned off his microphone. According to his testimony, as he started to walk away from Defendant, he noticed out of his peripheral vision that Defendant was walking toward the rental car. Officer Ramos testified that he immediately stopped, turned around and asked Defendant what he was doing. According to Officer Ramos, Defendant responded that he was going to get his jacket and Officer Ramos said, "No, just wait here. I'll get your jacket for you." Officer Ramos testified that he then went to Defendant's car and told Ms. Taylor that

---

[1] Officer Ramos testified that two other officers arrived at different points during the stop. By this time, there were three officers and three patrol cars on the scene, including Officer Ramos and his patrol car.

Defendant wanted his jacket.  According to Officer Ramos, Ms. Taylor looked at him "kind of strange," and then reached over, grabbed a leather jacket that was on the driver's side of the center console, and handed the jacket to Officer Ramos.  Officer Ramos testified that the jacket appeared very heavy.  Officer Ramos further testified that he pat searched the jacket for weapons and felt in one of the inside pockets of the jacket what was immediately identifiable as a handgun.  According to Officer Ramos, because he had already received information that Defendant was a convicted felon, he put the jacket down on the trunk of one of the patrol cars at the scene, placed Defendant under arrest for felon in possession of a firearm and put Defendant into one of the patrol cars.

At 10:19 a.m., Officer Ramos turned his microphone back on and returned to Defendant's car. He asked Ms. Taylor to step out of the car and conducted a pat down search of Ms. Taylor.  He advised Ms. Taylor that she was not being placed under arrest but that Defendant was and instructed her to wait in one of the patrol cars since it was much warmer in the car than it was outside.  Officer Ramos turned his microphone off for the last time at 10:29 a.m.

At 10:45 a.m., Sergeant Rudy Mora arrived with a dog.  The dog alerted to the area around the spare tire in the trunk of Defendant's car.  Officer Ramos testified that he removed the tire, cut it open with a knife and found four bundles of raw marijuana inside.  At that point, Officer Ramos testified, both Defendant and Ms. Taylor were placed under arrest and the marijuana, along with the handgun, the ammunition in the handgun, a holster found in the center console and a gun cleaning kit found in the trunk were taken back to the police office for continued investigation.

On March 11, 2003, a three-count Indictment was returned charging Defendant with felon in possession of a firearm, possession with intent to distribute less than 50 kilograms of marijuana, and possession of a firearm during or in relation to a drug trafficking crime.  On August 14, 2003,

Defendant filed the instant motion to suppress the statements and physical evidence obtained as a result of his detention.  The government filed a response in opposition on October 8, 2003.  On January 27, 2004, the Court held an evidentiary hearing.  During the hearing, the Court heard testimony and viewed the videotape of the stop.  At the conclusion of the hearing, defense counsel requested an opportunity to file a post-hearing brief.  The Court granted this request, and took the motion under advisement.  Defendant submitted his post-hearing brief on January 30, 2004 and the government submitted its response on February 6, 2004.

## DISCUSSION

Defendant argues that the evidence seized as a result of the traffic stop should be suppressed on the basis that his initial stop and his continued detention were invalid.  Specifically, Defendant challenges the initial justification for the stop, the reasonableness of his detention both before and after Officer Ramos issued him a citation and the length of his detention.  In his post-hearing brief, Defendant also challenges his pat down search as outside the scope of the stop.  The government opposes Defendant's motion on all of these grounds and, as a preliminary matter, argues that Defendant does not have standing to challenge the search of the rental car.

I.    Standing

The government asserts that Defendant has no standing to challenge the search of the rental car.  The issue of standing "'is invariably intertwined' with substantive fourth amendment analysis." *United States v. Arango*, 912 F.2d 441, 444 (10th Cir. 1990), *cert. denied*, 499 U.S. 924 (1991) (citing *Rakas v. Illinois*, 439 U.S. 128, 139 (1978)).  Accordingly, the Court must determine "'whether the challenged search or seizure violated the Fourth Amendment rights of [the] criminal defendant who seeks to exclude the evidence.'"  *Arango*, 912 F.2d at 445 (citing *Rakas*, 493 U.S.

at 140).  To determine whether a search has violated the rights of the defendant, the Court must consider whether the defendant "manifested a subjective expectation of privacy in the area searched and whether society would recognize that expectation as objectively reasonable." *Arango*, 912 F.2d at 445.

Defendant bears the burden of showing standing to challenge a search and seizure.  *See United States v. Martinez*, 983 F.2d 968, 972 (10th Cir. 1992), *cert. denied*, 508 U.S. 922 (1993). While "the proponent of a motion to suppress need not always come forward with legal documentation establishing that he lawfully possessed the area searched, the proponent must at least state that he gained possession from the owner or someone with the authority to grant possession." *Arango*, 912 F.2d at 445.  In *Arango*, the Tenth Circuit held that where a non-owner driver of a vehicle failed to present evidence that he lawfully possessed a vehicle stopped for speeding, the driver had no reasonable expectation of privacy in the vehicle.  Similarly, in *Martinez*, the Tenth Circuit found insufficient evidence that the defendant had a reasonable expectation of privacy in the car she was driving where she did not gain possession of the car from the registered owner but rather claimed to have borrowed the car from a friend in Las Vegas, who in turn got the car from her boyfriend, and there was no evidence that her friend had any authority to grant the defendant permission to possess the vehicle.  *See Martinez*, 983 F.2d at 973.  In a case indistinguishable from the instant one, *United States v. Obregon*, 748 F.2d 1371 (10th Cir. 1984), the Tenth Circuit upheld the following findings by the district court:

> Defendant had the keys to the car and may have had permission from the renter of the car to use it, but this is not determinative of the standing inquiry in this case. Defendant was driving a rented vehicle and was not named on the rental agreement or any other documents, either as the renter or as an authorized driver.  Defendant made no showing that any arrangement had been made with the rental car company

-12-

that would have allowed him to drive the car legitimately. . . . Defendant's relationship to the rented car is too attenuated to support a claim of standing.

*Id.* at 1374.

As the defendant in *Obregon*, Defendant herein has produced no evidence that he had a reasonable expectation of privacy in the rental car he was driving. Thus, the government is correct that Defendant does not have standing to challenge the search of the car. Nonetheless, Defendant can challenge the lawfulness of his own seizure. The issue of whether a defendant has standing to challenge the search of a vehicle subsequent to a traffic stop is separate from the issue of whether a defendant has standing to challenge the traffic stop itself as an illegal seizure. If a stop is unlawful, "the 'fruit of the poisonous tree' doctrine might dictate exclusion of the evidence discovered during the search." *United States v. Erwin*, 875 F.2d 268, 272 (10th Cir. 1989). "Even if defendant lacks standing to challenge the search of the car, if the initial stop was illegal, the seized contraband is subject to exclusion under the 'fruit of the poisonous tree' doctrine." *Id.* at 269 n.2.

Defendant does not base his motion on the illegality of the search itself. Rather, he contends that the stop constituted an illegal seizure under the Fourth Amendment and that the evidence discovered during the stop thus should be excluded. Thus, while Defendant may not have standing to challenge the search, Defendant is not foreclosed from arguing that the stop constituted an illegal seizure and that the evidence discovered during the stop should be excluded on that basis.

II.   Initial Stop and Further Detention

The Tenth Circuit explicitly has stated that "[s]topping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the detention is brief." *United States v. Zubia-Melendez*, 263 F.3d

1155, 1160 (10th Cir. 2001). Accordingly, a routine traffic stop is "'subject to the constitutional imperative that it not be "unreasonable" under the circumstances.'" *Id.* (citations omitted). The reasonableness of a traffic stop, which "is an investigative detention analogous to a *Terry* stop[,] . . . is evaluated in two respects: first, whether the officer's action was justified at its inception, and second, whether the action was reasonably related in scope to the circumstances that first justified the interference." *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994), *cert. denied*, 511 U.S. 1095 (1994).

A.   Justification at Inception of Stop

Under the first prong of this test, a traffic stop is justified at its inception so long as:

the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring. It is irrelevant, for purposes of Fourth Amendment review, "whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop." It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle. Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated "any one of the multitude of applicable traffic and equipment regulations" of the jurisdiction.

*United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995) (en banc) (citations omitted), *cert. denied*, 518 U.S. 1007 (1996).

In the instant case, Defendant argues that the initial stop of his car was pretextual, and that the real reason for the stop was the fact that Defendant and Ms. Taylor are African-American and the fact that their car had California license plates. In support of this argument, Defendant cites to inconsistencies between Officer Ramos' first report of the incident and his criminal complaint. Defendant also states that Officer Ramos omitted certain facts and altered facts from his initial report in order to write the criminal complaint.

Tenth Circuit precedent is clear that while selective enforcement of the law through practices such as racial profiling may provide a basis for an Equal Protection claim against an arresting officer, the fact that an officer engaged in such practices "has absolutely no bearing on whether the officer's traffic stop was reasonable under the Fourth Amendment." *United States v. Adkins*, 1 Fed. Appx. 850, 851 (10th Cir. 2001). Under *Botero-Ospina*, whether the officer's subjective motivations improperly involved race is irrelevant "[s]o long as the traffic stop was objectively reasonable." *Id*; *see also United States v. Phillips*, 1 Fed. Appx. 847, 849 (10th Cir.), *cert. denied*, 533 U.S. 922 (2001) (holding that, where objective facts justified traffic stop, officer's subjective reasons for stop, even if those reasons included race of occupants of car, were irrelevant). Thus, the only issue before the Court is whether Officer Ramos had reasonable suspicion that Defendant was in violation of any state traffic or equipment regulations.

During the hearing, Officer Ramos testified that he observed that Defendant's car was traveling at an increased rate of speed and was dangerously close to the white line separating the right lane from the shoulder of the road where he was standing next to his patrol car. In addition, Officer Ramos testified that he observed that the passenger in the car did not appear to be wearing her seatbelt. Finally, Officer Ramos testified that he engaged his radar equipment as Defendant drove past him and that his radar equipment indicated that Defendant's car was traveling at a speed of 84 mph in a 75 mph zone. As Officer Ramos admitted, there is no print-out to document the radar indication of Defendant's speed. Also as Officer Ramos admitted, once he stopped and approached Defendant's car, he observed that the passenger was wearing her seatbelt. Nonetheless, the Court found Officer Ramos' testimony as to his initial observations and as to the use of his radar detection equipment to be consistent and credible. Given his observations and the radar indication of

Defendant's speed, Officer Ramos had reasonable suspicion that Defendant was traveling at an illegal

speed and that his passenger was not wearing her seatbelt, both of which constitute violations of New

Mexico traffic or equipment regulations.  Accordingly, the traffic stop was justified at its inception.

   B.   Reasonably Related in Scope to the Circumstances of Stop

   Under the second prong of this test, an "officer conducting a routine traffic stop may request

a driver's license and vehicle registration, run a computer check, and issue a citation."  *Arango*, 912

F.2d at 446.  In addition, "questions about travel plans are routine and 'may be asked as a matter of

course without exceeding the proper scope of a traffic stop.'"  *United States v. West*, 219 F.3d 1171,

1176 (10th Cir. 2000) (citation omitted).  Once "the driver has produced a valid license and proof

that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject

to further delay by police for additional questioning."  *Arango*, 912 F.3d at 446.  Additional

questioning is permissible, however, if: "(1) 'during the course of the traffic stop the officer acquires

an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity'; or (2)

'the driver voluntarily consents to the officer's additional questioning.'"  *United States v. Elliott*, 107

F.3d 810, 813 (10th Cir. 1997) (citation omitted)**.**

   1.   Reasonable Suspicion

   Several factors may contribute to the formation of a reasonable and articulable suspicion of

illegal activity.  The Tenth Circuit expressly has held that "[a]mong those factors that have justified

further questioning are having no proof of ownership of the vehicle, having no proof of authority to

operate the vehicle, and inconsistent statements about destination."  *United States v. Hunnicutt*, 135

F.3d 1345, 1349 (10th Cir. 1998); *see also Arango*, 912 F.2d at 447 (because defendant never proved

that he had lawful possession of truck, officer was justified in detaining defendant while he tried to

contact registered owners; officer's inquiry regarding transportation of contraband was justified by defendant's inability to provide credible proof that he lawfully possessed truck, combined with inadequate amount of luggage for two week vacation); *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) ("contradictory or implausible travel plans can contribute to a reasonable suspicion of illegal activity."); *United States v. Toledo*, 139 F.3d 913 (10th Cir.), *cert. denied*, 524 U.S. 932 (1998) (unpublished opinion) (officers had reasonable suspicion based on four factors: defendant gave self-contradictory account of travel plans; rental car emitted strong odor of air freshener; defendant had previous drug conviction; and defendant acted nervously); *Martinez*, 983 F.2d at 976 (although encounter lasted longer than routine traffic stop, it did not exceed permissible bounds given uncertainty over whether defendants lawfully possessed vehicle).  Moreover, "the inability to offer proof of ownership or authorization to operate the vehicle has figured prominently in many [Tenth Circuit] cases upholding further questioning." *Hunnicutt*, 135 F.3d at 1349; *see also United States v. Villa-Chaparro*, 115 F.3d 797, 802 (10th Cir.), *cert. denied*, 522 U.S. 926 (1997) ("'[one] recurring factor supporting a finding of reasonable suspicion . . . is the inability of a defendant to provide proof that he is entitled to operate the vehicle he is driving.'") (citation omitted). Another factor is driving with a suspended license. *See Hunnicutt*, 135 F.3d at 1349 (citing *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995)).

        In the instant case, neither Defendant nor his passenger had a driver's license and thus neither was authorized to operate a car.  In fact, Defendant's only form of identification was an expired identification card.  The police check of that card revealed that there was no record in California of an individual with Defendant's identification number.  Moreover, Defendant was unable to provide Officer Ramos with a rental contract or any documentation showing that he was authorized to drive

-17-

the rental vehicle.  In fact, at no time during the stop did Defendant prove that he was authorized to operate the rental car.  The case law is clear that "an officer may detain a driver until assured that the driver's license is valid and the driver is legitimately operating the vehicle."  *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995).  Here, Officer Ramos "never received such assurances."  *Id.* Accordingly, "the duration of [Defendant's] detention was justified."  *Id.*

During the hearing, Officer Ramos identified other factors which, in combination with Defendant's lack of authorization to drive this or any other car, caused him to suspect that Defendant was engaged in illegal activity.  First, Officer Ramos testified that the statements provided by Defendant and Ms. Taylor regarding their travel plans were implausible and inconsistent.  Specifically, Officer Ramos testified that he found it extremely unusual that Defendant had a friend rent a car for him two weeks before his grandmother died, "almost pre-planning the grandmother's death." Moreover, Officer Ramos testified that while Defendant told him they were traveling to Alabama because his grandmother had died two days ago on January 2, 2003, Ms. Taylor told him that they were going to Alabama to visit Defendant's cousins.  According to Officer Ramos, Ms. Taylor spoke of the trip in a jovial manner, did not mention anything about Defendant's grandmother's death and said that they had originally planned to leave on January 1, 2003, which would have been one day before Defendant's grandmother passed away.  Officer Ramos testified that he found Ms. Taylor's statements and her demeanor in delivering those statements to be in direct conflict with what Defendant had informed him about their travel plans.

In addition to identifying inconsistencies in Defendant's and Ms. Taylor's statements regarding travel plans, Officer Ramos testified as to other factors that raised his suspicion. Specifically, Officer Ramos testified that Defendant displayed signs of nervousness, including

-18-

trembling hands, inability to maintain eye contact and fidgeting.  Similarly, Officer Ramos testified that Ms. Taylor's behavior was evasive, in that she pretended to have been sleeping when he approached her.  Finally, the criminal check of Defendant revealed that Defendant had a lengthy criminal history that included felony convictions.

In determining whether an officer had reasonable suspicion to detain an individual, the Court may not substitute its judgment for the officer but rather "must avoid 'unrealistic second-guessing' of police officers' decisions."  *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994) (citation omitted).  Moreover, the Court must "defer to 'the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions.'"  *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir. 1996) (citation omitted).  The Court itself does not find that Defendant's and Ms. Taylor's statements necessarily were implausible or contradictory.  Nonetheless, the Court finds credible Officer Ramos' testimony regarding his concerns about the implausibility and inconsistency of Defendant's and Ms. Taylor's statements, especially in light of the other factors identified by Officer Ramos.  Given Tenth Circuit precedent and considering the totality of the circumstances, the Court thus finds that Defendant's continued detention for questioning was supported by reasonable suspicion.

Moreover, the Court finds that Officer Ramos' questioning of Defendant regarding the transportation of contraband was not improper simply because it occurred after he issued the citation to Defendant.  As set forth above, such questioning is justified so long as an officer continues to reasonably suspect that an individual is engaged in criminal activity.  There is ample evidence that Officer Ramos' reasonable suspicion was not dispelled once he issued Defendant the citation.

2.    <u>Consensual Encounter</u>

-19-

"In determining whether a police-citizen encounter is consensual, 'the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *United States v. Hill*, 199 F.3d 1143, 1147 (10th Cir. 1999), *cert. denied*, 531 U.S. 830 (2000) (citing *Florida v. Bostick*, 501 U.S. 429 (1991)).  Each case "turns on the totality of the circumstances presented." *Id.* (citations omitted).  In the context of a traffic stop, a detention becomes a consensual encounter only "if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." *West*, 219 F.3d at 1176.  The return of a driver's documents alone does not end a detention if there is "evidence of a 'coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled.'" *Elliot*, 107 F.3d at 814 (citation omitted).  Similarly, an encounter after the return of documentation is "consensual only if 'a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information.'" *Id.* (citation omitted)

The Court strongly disagrees with the government's contention that, once Officer Ramos returned Defendant's documentation to him, the traffic stop became a consensual encounter.  There is absolutely no basis to conclude that the encounter between Defendant and Officer Ramos became consensual.  First, Officer Ramos never told Defendant that he was free to go.  To the contrary, several times both before and after he issued the citation Officer Ramos instructed Defendant to wait where he was -- outside next to the front bumper of the patrol car.  Indeed, after he issued the citation and Defendant told him that he was cold and wanted to leave, Officer Ramos said, "Okay, hold on

-20-

one second."  At that point, Officer Ramos told him that he was not free to return to his car and leave in it but rather that the car was to be impounded.  Officer Ramos then told Defendant to wait for him right there.  After approximately nine minutes, Officer Ramos returned to Defendant and rather than telling him that he was free to leave, told him that a drug dog was coming out, that he would get him on his way and that he would take him where he wanted to go.  A reasonable person would have believed that he was obligated to wait until Officer Ramos decided he was ready to leave and take Defendant with him.

Perhaps most telling is the fact that Officer Ramos never allowed Defendant to return to his car.  This is evidenced most clearly by the fact that, after he issued the citation, Officer Ramos refused to allow Defendant to retrieve his jacket from his car himself.  Indeed, Officer Ramos admitted that he would not have let Defendant return to his car at any point during the encounter.        Finally, the fact that there were three armed police officers and three police cars present during this encounter alone provides ample evidence of a coercive show of authority. For these reasons, the encounter between Officer Ramos and Defendant at no time became a consensual encounter.  As set forth above, however, the continued detention of Defendant was permissible because Officer Ramos acquired a reasonable suspicion that Defendant was engaged in illegal activity.

III.   Pat Down Search of Defendant

In the course of a lawful investigative detention, an officer may conduct a limited protective search for weapons.  *See United States v. Davis*, 94 F.3d 1465, 1468 (10th Cir. 1996).  Specifically, an officer is authorized  to conduct "a limited patdown for weapons where a reasonably prudent officer would be warranted in the belief, based on 'specific and articulable facts,' that he is dealing with an armed and dangerous individual."  *Maryland v. Buie*, 494 U.S. 325, 332 (1990) (citation omitted).  The Supreme Court has defined the permissible boundaries of a pat down search, which must be "strictly circumscribed by the exigencies which justify its initiation."  *Terry v. Ohio*, 392 U.S. 1, 26 (1968).  A pat down search "is not [intended] to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence."  *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (citations omitted).  Consequently, such a protective search, permitted without a warrant and in the absence of probable cause, "must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby."  *Terry*, 392 U.S. at 26.

According to his testimony, Officer Ramos conducts pat down searches in 98 percent of the traffic stops where the individual whom he has stopped puts his hands in his pockets.  Officer Ramos explained that he conducts such pat down searches for officer safety and for the individual's own safety.  Officer Ramos testified that it is his standard practice to request that an individual remove his hands from his pockets, inquire as to whether the individual has any weapons and then conduct a pat down search for weapons.  According to Officer Ramos, he was following this practice here because Defendant had his hands in the pockets of his sweatshirt.  The Court finds Officer Ramos' explanation to be credible and sufficient to support the pat down search.  As set forth above, the Court may not second-guess Officer Ramos' determination that such a search was necessary for his own safety and

Defendant's safety, especially in light of the fact that, at the time of the pat down search, Officer Ramos was alone with Defendant on the shoulder of Interstate 40.

IV.   <u>Length of Detention</u>

Whether a detention is too long in duration to be justified as an investigative stop depends upon "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). In making this assessment, the Court is instructed not to consider whether there is "some alternative means by which the objectives of the police might have been accomplished." *Id.* at 687. Moreover, an officer's investigation is not rendered unreasonable simply because "the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means." *Id.*

As set forth above, the detention of a driver arising out of a traffic stop may last as long as necessary for the officer to obtain assurances that the driver's license is valid and that the driver is legitimately operating the vehicle. *See Jones*, 44 F.3d at 872. In *Jones*, the officer detained the defendant for approximately thirty minutes after first stopping her for speeding. During the entire time of the detention, the officer was attempting to determine whether the defendant had a valid license and whether she was entitled to operate the rental car that she was driving. The Tenth Circuit found that the duration of the detention was justified since the officer never received any assurances that her license was valid or that she was legitimately operating the vehicle.

Similarly, in *Martinez*, the defendants challenged as unreasonable the length of their two hour detention arising out of a traffic stop. The Tenth Circuit rejected their argument, finding that the officers had ample suspicion to detain them for this entire period in an effort to ascertain the true

ownership of the vehicle they were driving.  Moreover, the Tenth Circuit found that the officers' stop and detention of the defendants, which involved a telephone call to the previously named owner of the car, a computer check and a call to a second Spanish speaking officer for assistance in questioning the defendants to ascertain ownership of the vehicle, were carried out in a manner designed to impose minimal intrusion upon the defendants.  The Tenth Circuit concluded, "[t]hough the encounter lasted longer than a routine traffic stop, we believe it did not exceed permissible bounds given the uncertainty over whether Defendants lawfully possessed the vehicle."  *Martinez*, 983 F.3d at 976.

Finally, in *United States v. Hbaiu*, 202 F. Supp.2d 1177 (D. Kan. 2002), approximately one hour and forty-five minutes elapsed from the time the troopers stopped the defendant and his co-defendants until the time that drugs were seized from the rental vehicle and the defendant was arrested.  Although recognizing that this length of time "in many circumstances may exceed the constitutional bounds of an investigative detention," the district court found that the delay was "attributable to a number of circumstances that were outside of the troopers' control."  *Id.* at 1185. Specifically, the court found the following factors to have contributed to the delay: the defendant and his co-defendants made up an elaborate story about the purpose and details of their trip; the defendant spent ten minutes looking for a key to his trailer; one of the co-defendants had a suspended license and the license produced by the defendant was suspect; the drug dog had to be summoned from a remote location; and the defendant's failure to produce the key to the trailer required an additional wait for bolt-cutters to arrive.  Given all of these circumstances, the court found that the length of the detention was not unreasonable.

In the instant case, Officer Ramos stopped Defendant at 9:00 a.m.  Until 9:54 a.m., Officer Ramos was taking reasonable steps to ascertain whether Defendant or Ms. Taylor had a valid driver's

license and whether Defendant or Ms. Taylor was authorized to operate the rental vehicle.  Officer

Ramos' efforts included contacting dispatch several times and calling Hertz on his cellular telephone.

These efforts were necessitated by the fact that neither Defendant nor Ms. Taylor provided Officer

Ramos with a valid driver's license, any documentation with regard to the rental car or a telephone

number for the rental car company.  In addition, a delay of almost twenty minutes resulted from

dispatch's failure to provide Officer Ramos with the correct telephone number for Hertz.  Also during

this period and continuing until 10:03 a.m., Officer Ramos was taking reasonable steps to ascertain

Defendant's criminal history.

As set forth above, based upon the totality of the circumstances, Officer Ramos continued to

suspect Defendant of criminal activity after he issued him the citation at 10:06 a.m.  Accordingly, it

was legitimate for Officer Ramos to further detain Defendant for additional questioning regarding the

transportation of contraband.  The period of further detention between the issuance of the citation

and Defendant's arrest was approximately ten minutes, from 10:06 a.m until 10:16 a.m.  It was

approximately thirty minutes later, at 10:45 a.m., that the dog alerted to the car and the marijuana was

discovered.

During the ten minute period between the issuance of the citation and Defendant's arrest,

Officer Ramos asked questions to dispel his suspicions regarding the presence of contraband and

attempted to secure Defendant's consent to search the car for such contraband.  In addition, at 10:12

a.m., Officer Ramos requested a dog to sniff the car for such contraband.  These steps constituted

the diligent pursuit of a means of investigation likely to confirm or dispel his suspicions quickly.

Officer Ramos did, however, admit that he was disingenuine with Defendant in an effort to

secure his consent to search the car.  Specifically, Officer Ramos testified that he told Defendant that

he was free to leave even though he was not free to leave and omitted any mention of the fact that Hertz had authorized Officer Ramos not only to impound the car but also to search it.  Officer Ramos admitted that he did this because he did not want to jeopardize the chance that Defendant would grant his consent to the search of the car.  The Court does not condone this sort of police tactic.  Once Officer Ramos had received information that Defendant was not authorized to drive the car and instruction from Hertz to impound and search the car, Officer Ramos could have cited Defendant, taken him where he wanted to go and then searched and impounded the car.

As the Supreme Court made clear in *Sharpe*, however, the fact that less intrusive means of accomplishing police objectives exist does not render an investigation unreasonable.  Under the relevant case law, this Court cannot conclude that Officer Ramos acted unreasonably in failing to recognize or pursue some alternative means of investigation.  Accordingly, the ten minute extension of the detention period from the issuance of the citation until Defendant's arrest was not unreasonable.  Similarly, given the fact that Officer Ramos called for a canine unit less than ten minutes after issuing the citation, the thirty minute period between Defendant's arrest and the dog's alert to the car was not unreasonable.

## **CONCLUSION**

Officer Ramos' stop of Defendant was justified at its inception.  Although the stop did not become a consensual encounter at any point, during the course of the traffic stop, Officer Ramos acquired an objectively reasonable and articulable suspicion that Defendant was engaged in illegal activity.  This suspicion was not dispelled after Officer Ramos issued Defendant the citation.  Accordingly, Defendant's further detention was reasonable.  Moreover, the pat down search conducted during the stop was within the permissible scope of an investigative detention.  Finally, as

Officer Ramos diligently pursued a means of investigation that was likely to confirm or dispel his

suspicions quickly, the length of the detention was not unreasonable.

**IT IS THEREFORE ORDERED** that Defendant Eric L. Johnson's Motion to Suppress

**[Doc. No. 19]** is hereby **DENIED**.

Dated this 25th day of February, 2004.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

<u>Attorney for Plaintiff</u>:
Roberto Ortega

<u>Attorney for Defendant</u>:
Joseph Gandert